**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| 1. THE ISLAMIC SOCIETY OF TULSA,<br><br>          *Plaintiff,*<br><br>v.<br><br>2. CITY OF BROKEN ARROW, OKLAHOMA;<br>3. DAVID PICKEL, in his individual capacity;<br>4. JUSTIN GREEN, in his individual capacity;<br>5. LISA FORD, in her individual capacity; and,<br>6. DEBRA WIMPEE, in her individual capacity;<br><br>          *Defendants.* | **COMPLAINT AND JURY DEMAND**<br><br><br>Civil Case No. 26-cv-00469-MTS |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, DAMAGES, AND JURY DEMAND

Plaintiff, Islamic Society of Tulsa ("IST" or "Plaintiff"), an Oklahoma domestic not for profit corporation, by and through its attorneys, files this Verified Complaint and Request for Injunctive Relief, Declaratory Relief, Damages, and Jury Demand against Defendant City of Broken Arrow, Oklahoma ("City") and City Councilors David Pickel, Justin Green, Lisa Ford, and Debra Wimpee, in their individual capacities as members of the City Council (collectively "Defendants").

1

**Introduction**

*"We strongly ask that you deny [IST's rezoning] request. Every country in Europe, once Muslims reached over 2% of the population, they started acting violently."* – **Email to Mayor Wimpee**, December 18, 2025

"I have the very same concerns." – **Mayor Debra Wimpee**, December 18, 2025

1.      Three decades ago, the Tulsa-area Muslim community wanted a place to worship together and teach their faith to the next generation. They built the Islamic Society of Tulsa to accomplish that goal.

2.      With prayer and classroom spaces, a free medical clinic aimed at serving those who cannot pay, and funeral services for the deceased, IST's mosque in Tulsa has strived to be a place where all of the Tulsa-area Muslim community can worship.

3.      But after almost 30 years of growth, the spiritual needs of Muslims in Broken Arrow cannot be served by the community's Tulsa house of worship alone. The mosque in Tulsa is too small, and the Muslims in Broken Arrow are too numerous and too far spread.

4.      Realizing this problem, IST purchased land in Broken Arrow with the hope of expanding. The land they purchased was right next to another church, located in the vicinity of several more, and suitable in every way for the construction and operation of a house of worship.

5.      The City's own professional staff recommended approval of IST's project. So did the City's Planning Commission. However, after a wave of bigoted opposition from members of the community and local politicians, the City Council voted to deny IST's applications.

6.      The City Council's decision was a stark departure from the norm. The City regularly approves nearly identical applications for churches, such as Harvest Church and

2

Church on the Move, two of the dozens of churches in Broken Arrow. The City also grants similar requests for non-religious entities, even those with massive commercial footprints, such as the recent 37-acre Aequitas Tucson Development or the 350-resident development, Aspen Creek Villas.

7. However, when Muslims in Broken Arrow sought to do the same, the City Council denied them. And the latest media reports containing the email correspondence between constituents and councilmembers reveal why: animosity towards Muslims and an irrational fear of Islam.

8. The City of Broken Arrow violated IST's constitutional and statutory rights to use their land for worship and to not be treated differently simply because of their faith. Having failed to meet its legal obligations, IST now seeks the Court's intervention to compel the City to do so.

## Jurisdiction and Venue

9. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States, including claims under the First and Fourteenth Amendments brought through 42 U.S.C. § 1983, and claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq.

10. This Court also has original question jurisdiction, pursuant to under 28 U.S.C. § 1343(a)(3) and (4) over IST's claims under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the First and Fourteenth Amendments. IST asserts those claims against the City and against David Pickel, Justin Green, Lisa Ford, and Debra Wimpee in their individual capacities. At all relevant times, Pickel, Green, Ford, and Wimpee

acted under color of state law, including when each personally participated in and voted for the challenged denial.

11.     RLUIPA applies to the City's denial of IST's applications. The City is a "government" within the meaning of RLUIPA. The City's zoning ordinance, rezoning process, and conditional use permit process are "land use regulations" within the meaning of RLUIPA because they restrict the use or development of land in which IST has a property interest. The City imposed the challenged burden through a land use regulatory system that permits individualized assessments of proposed property uses, including discretionary review of rezoning and conditional use permit applications by City staff, the Planning Commission, and the City Council.

12.     This action presents an actual, ripe, and ongoing case or controversy. On January 12, 2026, the City, acting through its City Council, denied IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025. That denial was final municipal action. As a result, IST cannot proceed with the platting, site plan, engineering, permitting, construction, and religious use of the Subject Property for the mosque and Islamic community center proposed in its applications.

13.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over IST's claim under the Oklahoma Religious Freedom Act ("ORFA"), 51 O.S. §§ 251 et seq., because that claim forms part of the same case or controversy as IST's federal claims.

14.     This Court may grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and injunctive relief under 42 U.S.C. § 1983, RLUIPA, ORFA, and the Court's equitable authority, in accordance with Rule 65 of the Federal Rules of Civil Procedure.

4

15.    This Court has personal jurisdiction over Defendants because the challenged acts and omissions occurred in Oklahoma and concern real property located in this District. Pickel, Green, Ford, and Wimpee each personally participated in the challenged denial while serving on the Broken Arrow City Council.

16.    Venue is proper as to all Defendants under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and decisions giving rise to IST's claims occurred in this District, and the real property at issue is situated in this District.

17.    IST seeks reasonable attorneys' fees under 42 U.S.C. § 1988(b) and costs under Federal Rule of Civil Procedure 54(d), together with any other fees and costs authorized by applicable federal or state law.

## Parties

18.    Plaintiff Islamic Society of Tulsa ("IST") is an Oklahoma domestic not for profit corporation with its principal place of business at 4630 S. Irvington Ave. Tulsa, Oklahoma 74135. IST is an Islamic religious institution and religious assembly within the meaning of the RLUIPA. IST operates a mosque in Tulsa and seeks to construct and use the Subject Property in Broken Arrow for prayer, worship, religious education, charitable services, community services, and other religious exercise. IST is governed and led by its Majlis Al-Shura (advisory council). IST purchased the Subject Property for the purpose of developing a mosque and Islamic community center. Legal title to the Subject Property is held by the North American Islamic Trust ("NAIT") in a custodial and/or asset protection capacity for IST's benefit. IST funded, directed, and submitted the applications at issue, controls the proposed religious use and development, intends to use the Subject Property for religious exercise, and holds beneficial, equitable, contractual, use, and/or other property

interests in the Subject Property. NAIT has authorized and ratified IST's prosecution of this action and agrees that IST may seek all relief necessary to protect and develop the Subject Property for IST's religious use. City records sometimes refer to IST's proposed Broken Arrow facility and/or applications as the "Islamic Center of Tulsa." Unless otherwise indicated, references to IST in this Complaint include the applicant, project, and proposed religious facility identified by the City as "Islamic Center of Tulsa" in connection with BAZ-002469-2025 and SP-002526-2025.

19.    Defendant City of Broken Arrow, Oklahoma is a municipal corporation and political subdivision of the State of Oklahoma. The City acts through its City Council, which is the final decisionmaker for rezoning and conditional use permit applications under the Broken Arrow City Ordinance, including those submitted by IST, which the City denied. The City administers and enforces its zoning ordinance, comprehensive plan, rezoning procedures, conditional use permit procedures, platting requirements, site plan requirements, engineering requirements, and permitting requirements through its City Council, Planning Commission, Community Development Department, employees, agents, and officials.

20.    At all relevant times, Defendant David Pickel served as a member of the Broken Arrow City Council. Pickel personally participated in the challenged denial by voting in favor of the motion to deny IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025. Defendant Pickel is being sued in his individual capacity, only.

21.    At all relevant times, Defendant Justin Green served as a member of the Broken Arrow City Council. Green personally participated in the challenged denial by voting in favor of the motion to deny IST's rezoning application, BAZ-002469-2025, and conditional use

permit application, SP-002526-2025. Defendant Green is being sued in his individual capacity, only.

22.     At all relevant times, Defendant Lisa Ford served as a member of the Broken Arrow City Council. Ford personally participated in the challenged denial by voting in favor of the motion to deny IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025. Defendant Ford is being sued in her individual capacity, only.

23.     At all relevant times, Defendant Debra Wimpee served as the mayor of Broken Arrow and as a member of the Broken Arrow City Council. Wimpee personally participated in the challenged denial by voting in favor of the motion to deny IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025. Defendant Wimpee is being sued in her individual capacity, only.

24.     Pickel, Green, Ford, and Wimpee are referred to collectively as the "Individual Councilors." At all relevant times, each acted under color of state law in exercising the authority of a City Council member. IST sues each Individual Councilor in his or her individual capacity and asserts its constitutional claims under 42 U.S.C. § 1983 based on each Councilor's personal participation in the challenged denial. IST does not sue the Individual Councilors in their official capacities and does not assert its RLUIPA claims against them.

**Background**

**I.    Broken Arrow's Rezoning and Conditional Use Permit Regulations**

25.    Broken Arrow's land use decisions are governed by the Next Comprehensive Master Plan and the City's Zoning Ordinance. The provisions of the Zoning Ordinance are designed to implement the policies of the Comprehensive Plan and ensure that land use decisions are rooted in objective planning criteria rather than ad hoc or discriminatory processes. Zoning Ordinance § 6-1-1.

26.    Each property in Broken Arrow is assigned a zoning district, which determines what uses are permitted as of right, what uses are permitted with additional approval, and what uses are prohibited. Certain uses require a conditional use permit ("CUP") before they may be established in a particular zoning district. The City's Comprehensive Plan also assigns properties a Land Use Intensity System ("LUIS") classification, which guides the City's analysis of the intensity, compatibility, and appropriateness of proposed land uses. Comprehensive Plan § 4.

27.    A property owner or applicant seeking to change a property's zoning district must submit a rezoning application. A property owner or applicant seeking to establish a conditional use must submit a CUP application. Rezoning applications and CUP applications are reviewed through a discretionary, individualized land use process in which the City evaluates the specific property, the proposed use, surrounding land uses, compatibility, anticipated impacts, available facilities and services, mitigation measures, consistency with the Comprehensive Plan, and compliance with the Zoning Ordinance.

28.    Under the Zoning Ordinance, applications for rezoning and CUP are reviewed through a structured process. Applications are first reviewed by City Staff, who prepare a staff

report indicating whether, in staff's opinion, the application complies with applicable standards and whether approval, approval with conditions, or denial is recommended. The application is then heard by the Broken Arrow Planning Commission, which may recommend approval, approval with conditions, or denial. The application then proceeds to the City Council for a hearing and final municipal decision. Zoning Ordinance § 6-3-1.

29.     The Zoning Ordinance permits the Planning Commission and City Council to approve applications with conditions. For example, conditions may be imposed to reduce or minimize potential adverse impacts, to address compatibility issues, and to carry out the general purpose and intent of the Comprehensive Plan and Zoning Ordinance. The Zoning Ordinance also permits the City Council to refer applications back to the Planning Commission or to a committee of the City Council for further consideration. Zoning Ordinance § 6-3-4.2.

30.     The Zoning Ordinance also distinguishes rezoning and CUP approval from later stages of development review. Approval of a rezoning or CUP does not eliminate the City's later authority to require compliance with platting, site plan review, engineering review, traffic, drainage, stormwater, floodplain, utility, parking, building code, permitting, inspection, and occupancy requirements. Those later reviews remain available to address technical development issues after discretionary zoning approval.

31.     For development proposals requiring more than one application, the Zoning Ordinance allows concurrent applications to be submitted and considered. But deciding bodies considering concurrent applications must make separate recommendations and decisions on each application based on the standards applicable to the specific application. Zoning Ordinance § 6-3-2.10.

32.     If an application is denied, the Zoning Ordinance requires the deciding body to provide "a clear statement of the basis upon which the decision was made, including specific, written findings of fact with reference to the relevant standards of this Ordinance." Zoning Ordinance § 6-3-2.9(B).

33.     The Zoning Ordinance mandates that decisions regarding rezoning and conditional use permits be based on defined, objective standards—including consistency with the Comprehensive Plan, compatibility with surrounding land uses, and the promotion of the public health, safety, and welfare. Zoning Ordinance §§ 6-3-4.2(B), 6-3-4.4(B). These standards prohibit the City from exercising arbitrary or unbridled discretion; the City must provide a rational, fact-based justification that aligns with these established regulatory criteria.

34.     Section 6-3-4.2(B) of the Ordinance sets forth the criteria for approval of a rezoning application, including whether the rezoning: 1) promotes the public health, safety, and general welfare; 2) is consistent with the Comprehensive Plan and the Zoning Ordinance; 3) is consistent with the stated purpose of the proposed zoning district; 4) is not likely to result in significant adverse impacts upon other properties in the vicinity of the subject property; and 5) will allow future uses on the subject property that are compatible in scale with uses on other properties in the vicinity.

35.     Section 6-3-4.4(B) sets forth the criteria for approval of a CUP, including whether: 1) any conditions imposed are no less restrictive than the requirements of the Zoning Ordinance; 2) adequate assurances of continuing maintenance; 3) facilities and services will be available to serve the subject property while maintaining adequate levels of service for existing development; 4) adverse impacts will be mitigated to the maximum extent practicable; 5) the proposed use is compatible with adjacent uses; 6) the proposed use is

consistent with any applicable CUP standards; 7) the purpose is consistent with the intent of the zoning district in which it is located; and 8) the proposed use is consistent with the Comprehensive Plan, the Zoning Ordinance, and applicable state and federal regulations.

## II.    The Islamic Society of Tulsa and the Subject Property

36.    The Islamic Society of Tulsa is an Islamic religious organization based in Tulsa, Oklahoma, where it operates a mosque. Through that mosque, IST provides congregational prayer, religious education, Ramadan programming, charitable services, community services, interfaith engagement, and other religious and community programming.

37.    IST's existing Tulsa mosque is the only mosque IST currently operates. The Tulsa facility serves Muslims from Tulsa, Broken Arrow, and surrounding communities. IST's existing facility is overcrowded, particularly during Friday congregational prayers and Ramadan, and many Broken Arrow Muslim residents must travel outside Broken Arrow to participate in congregational prayer, religious education, and other religious programming. IST seeks to establish a mosque and Islamic community center in Broken Arrow so that IST and its members can gather to worship where many of them live, work, raise families, and serve the community.

38.    In 2014, IST purchased approximately 15.06 acres of undeveloped property in Broken Arrow for the purpose of developing a mosque and Islamic community center ("the Subject Property"). The Subject Property is located 0.5 miles north of Tucson Street (East 121st Street), just south of route 364 (Creek Turnpike), and just east of Olive Avenue (129th E. Avenue).

39.    City records refer to the applications for the Subject Property as BAZ-002469-2025 and SP-002526-2025 and sometimes identify the applicant or proposed facility as the "Islamic Center of Tulsa."

40.    Legal title to the Subject Property is held by the North American Islamic Trust ("NAIT") in a custodial capacity for IST's benefit. IST purchased the Subject Property for its own religious use, funded and directed the proposed development, submitted and pursued the applications at issue, controls the proposed religious use and development of the Subject Property, and holds contractual and other property interests in the Subject Property.

41.    The Subject Property is currently zoned Agricultural and Floodplain ("AG" and "FD"). IST sought to rezone the developable portions of the Subject Property to Commercial General ("CG") while retaining the applicable Floodplain designation. The City's records describe IST's rezoning application as a request to change the zoning from AG/FD to CG/FD for a mixed development consisting of a commercial retail component along Olive Avenue, an Islamic Center in the central portion of the site, and a rear area reserved for a retention pond and undeveloped floodplain land.

42.    The Subject Property is designated Level 6 – Regional Employment/Commercial – under Broken Arrow's LUIS system. The Comprehensive Plan describes Level 6 as an opportunity to develop regionally significant and highway-oriented commercial and employment nodes in the vicinity of major transportation corridors, including key interchanges along the Creek Turnpike. Level 6 contemplates a mixture of medium- to high-intensity commercial and employment uses, including commercial, retail, automotive, office, and employment center uses.

43. City Staff determined that the Subject Property's Level 6 designation supported commercial uses, that IST's rezoning request complied with the Comprehensive Plan, and that a place of assembly is allowed in both the existing and proposed zoning districts with a conditional use permit.

44. Moreover, the site falls within the "Commercial Retail Expansion" category of the City's Comprehensive Plan. The City's own planning goals explicitly identify this property as ideal for such expansion. Comprehensive Plan, § 3. Accordingly, IST's proposal was not only compatible with the City's growth objectives but was, in fact, specifically aligned with the City's long-term land use vision.

45. Surrounding properties are zoned for a mixture of uses and reflect the area's transition toward more development, including existing places of assembly. The site's location, accessibility, and planning designation render it uniquely suited for the proposed religious and commercial use.

46. IST's proposed use of the Subject Property constitutes religious exercise. IST's ability to build, use, and develop the Subject Property for a mosque, Islamic community center, religious education, charitable programming, and related religious and community uses is central to IST's mission and to the religious exercise of IST, its members, and the Broken Arrow Muslim community.

III.    **The Islamic Society of Tulsa's Applications**

47. In 2025, IST submitted two related applications to the City for the Subject Property. IST submitted BAZ-002469-2025, a rezoning application seeking to rezone the Subject Property from Agricultural (AG) and Flood Plain (FP) to Commercial General (CG) and Flood Plain (FP). IST also submitted SP-002526-2025, a conditional use permit

application seeking approval to use the Subject Property as a place of assembly for a mosque and community center.

48.    IST's applications proposed a phased, mixed-use development. The proposed development included a commercial retail component along Olive Avenue, a mosque and Islamic community center in the central portion of the site, and a rear area reserved for stormwater detention, existing pond/floodplain features, septic or utility infrastructure, and undeveloped floodplain land.

49.    The requested Commercial General zoning was consistent with the future commercial component and with the Subject Property's Level 6 Regional Employment/Commercial designation. The mosque and Islamic community center component is separately allowed as a place of assembly through the conditional use permit process.

50.    As part of its application, IST submitted a conceptual site plan. The conceptual plan included, among other things, a future retail building, a Phase 1 mosque/community center building, parking areas, access from Olive Avenue, stormwater detention, and utility/septic planning.

51.    This plan served as a preliminary framework, intended to demonstrate the feasibility of the project. Under standard municipal planning practice, detailed engineering, final traffic and parking calculations, formal drainage and stormwater management, and specific utility permitting are addressed during the formal site plan and engineering review phases that follow, not precede, the initial rezoning and CUP approval.

52.    City Staff, having conducted a technical review of IST's applications, recommended approval of both. Staff advised that the Subject Property's Level 6 designation

supported commercial uses, that IST's rezoning request complied with the Comprehensive Plan, that a place of assembly is allowed in both the existing and proposed zoning districts with a conditional use permit, and that infrastructure and technical issues would be addressed during engineering and formal site plan review.

53.    Regarding the infrastructure and technical concerns subsequently raised by the Council, City Staff explicitly affirmed that these matters were not ripe for determination at the rezoning/CUP stage. Staff confirmed that those technical issues were appropriate for, and would be satisfied during, the subsequent formal engineering and site plan review process.

**IV.    The Planning Commission Recommended Approval of Both IST Applications.**

54.    On December 18, 2025, the Broken Arrow Planning Commission ("the Commission") held a public hearing on IST's rezoning and a conditional use permit applications.

55.    The hearing drew a large audience and lasted over four hours. Over forty individuals spoke at the hearing.

56.    Jose Jiminez presented the applications on behalf of the City's professional Staff. He explained that the Subject Property is designated Level 6 under the Comprehensive Plan, which supports commercial uses; that access is planned from Olive Avenue; and that parking details would be finalized during site plan review. He further explained that any development would be subject to City and FEMA requirements. He advised that based on the applications' consistency with the Comprehensive Plan, the Subject Property's location and surrounding land uses, City staff recommended approval of both the rezoning and the conditional use permit applications.

57. Rick Brown, the architect representing IST, explained to the Commission that the project was planned as a multi-phase development. He also noted that other places of assembly, including a church, already existed nearby.

58. The floor subsequently opened for public comment. Opponents expressed practical concerns regarding traffic, flooding, and noise pollution from calls to worship. Mr. Jiminez addressed these concerns. He explained that the flooding risk is mitigated by the fact that the property will not have a basement; the traffic impact is minor because weekday prayer attendance is small and they would dedicate a right-of-way during platting; and noise concerns are not necessary because they do not broadcast calls to prayer over an external speaker.

59. However, a large portion of the speakers' concerns were not at all related to the land use. Rather, dozens of speakers opposed the application on religious grounds—they didn't want a mosque in their city:

- "We do not need or want another Dearborn, Michigan or East Plano Islamic Center," said one resident. "Islam is incompatible with our constitution."

- Another resident said, "[I] don't want to put up with [Muslim people] here. They will never tell you the truth if they don't have to. This will be right next to a Christian church and that blows my mind."

- "We don't want [Islam] imposed on our kids. I have a daughter who's fifteen years old, and I don't want this ideology imposed on her," said another.

60. At the conclusion of the public comments, the Commission discussed the applications on the record. The Commission agreed that they should consider the two applications separately, noting that the denial of either application would not prohibit the approval of the other.

16

61. The commissioners agreed that the comprehensive plan clearly supported the rezoning request. Some members raised concern, however, over the conditional use permit, noting that there was already a Christian church on the land, and having two places of assembly right next to each other would be a concern for tax revenue. One commissioner explained in response that there is nothing in the comprehensive plan that restricts proximity of multiple places of assembly.

62. The Planning Commission recommended approval of the rezoning application by a vote of 4–1 and recommended approval of the conditional use permit by a vote of 3–2, subject to a condition prohibiting outdoor speakers. IST accepted that condition.

63. The recommendation was immediately followed by shouts from the crowd, calling the Commission "cowards" and "terrorists."

**V.    Public Opposition and Political Pressure Intensified after the Planning Commission Recommended Approval.**

64. The Planning Commission's recommendations were followed by hostile public comments and threats against both IST and the City.

65. In the weeks leading up to and following the Planning Commission hearing, dozens of residents sent emails to the City Council urging it to deny IST's applications. The emails included allegations that Islam was a cancer to society and calling Muslims terrorists. One resident sent an email threatening that if Wimpee did not oppose the applications, she would "never receive votes from me or the multitude of people like me that live in this community. We will donate money to your opposition during the next election cycle. We will campaign and go door to door asking other citizens to turn away from supporting you."

17

66.    On December 19th, the Tulsa Planning Office received a phone call threatening to cut the limbs off of anyone who voted to approve the mosque. The Office alerted the Broken Arrow police department.

67.    The hostility manifested on social media as well. On a KOTV News Facebook post reporting the Planning Commission's action, commenters wrote: "Bash that s*** like a mailbox Oklahoma" and "Isn't the land next to it still zoned farm? Wouldn't it be ironic if someone started raising pigs on it?"

68.    Other social media comments urged the City Council to deny IST's applications and warned of electoral consequences if it approved them. One commenter wrote on Wimpee's personal Instagram account addressing the Planning Commission's decision, "[i]f they allow this will have to see about them not being elected again for not listening to the people in Broken arrow." Another commenter seemingly addressed the council directly, stating, "You're asking for war." On January 6, 2026, six days before the City Council hearing, the Conservative organization, Constitutional Grounds held a meeting to organize opposition to the proposed mosque. More than two hundred people attended. Attendees received flyers criticizing Islam and associating it with terrorism.[1]

69.    Oklahoma State Representative Gabe Woolley also publicly opposed IST's applications. Before the Planning Commission hearing, Woolley had argued against the applications on the ground that the United States is a Christian nation. After the Commission

---

[1] Samson Tamijani, *'Strategy' meeting organizes opposition to planned Broken Arrow mosque*, 2 News Oklahoma, January 6, 2026, https://www.kjrh.com/news/local-news/strategy-meeting-organizes-opposition-to-planned-broken-arrow-mosque

recommended approval, he stated, "This is not the direction many of us want to see our state or nation heading. Please seek discernment and strategy in prayer."[2]

70.     On January 8, 2026, four days before the City Council Hearing, Oklahoma Attorney General Gentner Drummond announced that his office would investigate whether the proposed mosque complied with Oklahoma law and applicable federal statutes and would investigate NAIT for alleged ties to the Muslim Brotherhood.

## VI.     City Council Members Expressed Islamophobic Bias Leading up to the Vote.

71.     Email communications from City Council members leading up to the City Council hearing reveal that they encouraged and agreed with the public's bias.

72.     In the weeks before the hearing, the City received dozens of emails from residents urging the Council to deny the applications, in which they referred to Muslims as terrorists, accused Muslims of attempting to take over "our Christian state," and accused Islam of being a springboard for radicalism.

73.     However, rather than disregard these comments relating to issues irrelevant to their decision, multiple Council members responded affirming and encouraging the bias against Muslims and Islam.

74.     In response to several emails expressing bigoted concerns about Muslims worshipping in Broken Arrow, Wimpee responded via email stating that she had the "very same concerns."

---

[2] Ian M. Giatti, *Okla. lawmaker urges constituents to pray after massive Islamic development gets preliminary OK,* The Christian Post, December 26, 2025, https://www.christianpost.com/news/okla-lawmaker-calls-for-prayer-after-islamic-development-gets-ok.html

75.    For example, in an email to Wimpee sent on December 18, 2025, one resident urged her to deny IST's applications because in European countries, "once Muslims reached over 2% of the population, they started acting violent." Wimpee responded to this email stating that she had "the very same concerns." In another instance, Wimpee responded to an email urging her to deny because mosques attract Muslim communities and seek to implement Sharia law by stating: "I share your concerns as I'm sure you're aware."

76.    Ford had the same illegal motive. In a December 29th email to Ford, one resident wrote: "Please wake up Broken Arrow leaders! Islamic Muslims come into a neighborhood quietly, then quickly move in many Muslims until they have a voting block to replace you. Then you have cities like Chicago. New York. and Minneapolis. It happens quickly when Christians honor a god who does not honor Jesus as the Son of the God of the Bible. Allah is not God, and his people do not honor Jesus as God's son but as a prophet only." Ford responded to this bigoted email 30 minutes later: "I agree with everything you pointed out."

## VII.    The City Council Denied Both of IST's Applications Despite Recommendations from City Staff and the Planning Commission.

77.    On January 12, 2026, the City Council convened a special meeting and public hearing to consider IST's rezoning and conditional use permit applications. Because of the anticipated attendance and public comment, the City held the meeting at a larger venue than the Council's usual meeting place. The City also deployed extensive security measures, including metal detectors, explosive detection dogs, bomb squad personnel, and SWAT officers positioned on the roof. More than 1,000 people gathered at the venue, which included a 350-seat auditorium.

78.    Community Development Director, Rocky Henkel, presented the applications on behalf of City staff. He explained that the Subject Property's Level 6 designation supports commercial uses; that the rezoning request was consistent with the Comprehensive Plan and surrounding land uses; and that a place of assembly is permitted in the requested Commercial General district with a conditional use permit. Henkel further explained that parking would be evaluated under the Zoning Ordinance, infrastructure issues would be addressed during engineering review, and IST would be required to dedicate right-of-way for a future frontage road during platting.

79.    Following Mr. Henkel's presentation, the Council received public comment. The hearing lasted more than four hours, and more than forty speakers addressed the Council both in favor of and opposition to IST's applications. Some opponents raised traffic capacity concerns, including possible congestion on Olive Avenue during periods of peak attendance.

80.    Nicole Watts, an engineer speaking on IST's behalf, responded that current traffic volumes on Olive Avenue are well below the roadway's capacity and that the Project's anticipated weekday peak use would occur during off-peak traffic hours. She explained that the conceptual site plan included a right-of-way dedication for a future access road and that IST would continue working with city staff through engineering and permitting review to address any remaining traffic issues. Watts further stated that Broken Arrow had approved similar places of assembly in commercially zoned and Level 6 areas, making IST's applications consistent with prior City decisions.

81.    Council members also questioned whether IST's conceptual plans provided sufficient parking, noting that earlier plans reflected several hundred spaces. Watts explained

21

that those figures were preliminary and that the parking plan had since been revised to comply with the Zoning Ordinance.

82.    Opponents of the project also raised concerns about flooding and sewage capacity given that the property contains floodplain areas. Watts explained that development would consist of careful engineering compliance. She also identified that the site plan includes a detention pond designed to meet state discharge requirements and improve downstream flooding conditions. She reminded the Council that no development can occur in regulated floodplain or floodway areas without federal approval, and that all development would be subject to subsequent city approval.

83.    Apart from the opposition based on traffic and sewage concerns, many speakers opposed the applications for a simpler reason—their opposition to Islam and Muslims. One resident spoke in opposition, arguing that Christian teachings do not support an "anything-goes" approach and that citizen sentiment should be considered in the council's decision. Another resident spoke in opposition, stating that Islamic teachings—particularly Sharia law—are incompatible with the U.S. Constitution. That resident emphasized that his objection was based on ideology. Another resident urged denial on the basis that he opposes Islamic doctrine, which he characterized as inherently dangerous and incompatible with peaceful coexistence.

84.    After hours of public comment, Ford announced that the City Council had heard all that they needed to hear from the public and would pass to IST to provide final remarks. Members of the audience immediately shouted at the City Council, saying it was their right to keep expressing concerns. One member screamed "how dare you do this to the Broken Arrow people," before being removed from the hearing.

85.     In the final remarks, a member of IST addressed several of the City Council's concerns. He stressed that all concerns regarding traffic, flooding, and infrastructure would, as is standard, be addressed during the permit process and subject to approval by city officials. He reminded the Council that this was simply a request to rezone and use the property for a place of assembly. Nonetheless, to address concerns about flooding, the IST member offered to present Gary Cruz, the president of the neighborhood association of IST, to explain how flooding concerns at IST's Tulsa property were successfully addressed through the implementation of a detention system. The Council refused his request to speak.

86.     City Council deliberated the applications for roughly two minutes. The Council agreed to consider both applications under "one vote," despite Zoning Ordinance Subsec. 6-3-2.10 requiring that they be considered separately and despite each application having a separate set of separate requirements.

87.     In their two minutes of deliberation, the City Council provided no specificity regarding the requirements laid out in the zoning ordinance. Rather, they voiced vague concerns regarding land use. Wimpee stated summarily that the proposal did not "meet city requirements" and did not "align with our comprehensive plan and ordinances," a statement directly contradicted by the Planning Commission's findings and recommendations. Ford gave similarly generalized concerns, stating, "I personally don't feel that this project is acceptable for this current land use." Green referenced "land use issues and infrastructure issues," but did not specify what those issues were. None of the Councilors explained or justified their reasons for deviating from the Planning Commission's recommendation.

88.     Green moved to deny both requests in full in a single vote. Ford, Pickel, and Wimpee also voted to deny. Councilor Parks was the sole voter in favor.

89.    In evaluating and denying Applications BAZ-002469-2025 and SP-002526-2025, the individual Councilors were not engaged in general, prospective policymaking, but were rather executing a discrete adjudication of a single applicant's land use rights.

90.    The City Council never provided a clear statement to IST outlining the basis of the decision and specific, written factual findings, as required by Zoning Ordinance § 6-3-2.9(B).

91.    In the months following the denial, IST members sought explanation from the City as to their reasons for denial. In one communication, Ford stated that her denial was based on four reasons: 1) the property's potential negative impact on water quality 2) increase in traffic congestion along Olive Avenue, 3) commercial development wasn't to occur until a later phase and thus rezoning to commercial was premature, and 4) the land use was intended for a hospital or regional employer. When explaining her concerns regarding traffic congestion along Olive Avenue, she stated that "the proposed use could add more than 700 vehicles during peak times, and it is unclear whether existing infrastructure can safely support that increase."

92.    Despite relying on concerns about inadequate traffic and infrastructure impact, neither Ford nor any other Councilor voted to send the applications back to the Planning Commission for further review and infrastructure analysis, as permitted by the Zoning Ordinance.

## VIII.    The City Council Approved Other Applications Involving Comparable Land Use Issues Before and After Denying IST's Applications.

93.    Before and after denying IST's applications, the City Council approved several similar applications involving similar properties and the same land use issues it invoked

against IST, including traffic, floodplain conditions, infrastructure, phased development, and compatibility.

**A. Aspen Creek Villas**

94. On May 19, 2026, the Council approved rezoning application BAZ-001891-2024 and planned unit development application PUD-001893-2024 for Aspen Creek Villas, a proposed 350-residence development. The property is located just north of Tucson Street and about one quarter mile east of Olive Avenue, in the same general corridor as the Subject Property. Like the Subject Property, it was zoned Agricultural, and the applicant sought rezoning to permit the proposed development.

95. The Planning Commission first considered the applications in February 2026. After significant traffic concerns were raised, the Commission tabled the applications to allow the applicant an opportunity to submit a more detailed site layout. Following revisions by the applicant, the Commission recommended approval in April 2026.

96. The City Council first considered the applications on May 5, 2026. Council members again discussed traffic concerns. Charlie Bright, the City's Director of Engineering and Construction, advised that traffic analysis and mitigation measures would be evaluated during engineering review. The Council tabled the applications for further consideration.

97. When the Council resumed consideration of Aspen Creek Villas on May 19, 2026, Community Development Director Rocky Henkel presented the applications. Two residents raised concerns about traffic, school capacity, and ongoing development. Bright responded to questions concerning traffic conditions on Olive Avenue and Tucson Street and acknowledged that home construction would begin before those roadways could be widened. The Council noted that while that portion of Olive Ave was not included in the recently

approved 2026 Bond Package for road expansion, there were other road widening and intersection improvement projects planned to ease traffic concerns in the area.

98.     Ford moved to approve BAZ-001891-2024 and PUD-001893-2024, and Green seconded the motion. Ford, Green, Wimpee, and Pickel—the same four Individual Councilors who voted to deny IST's applications—voted in favor.

## B.  Aequitas

99.     On August 4, 2025, the City Council also approved rezoning application BAZ-002280-2025 and related planned unit development application PUD-002519-2025 for the Aequitas Tucson Development. The rezoning application sought to change the property's zoning from Agricultural to Commercial Heavy, while the related development contemplated future residential development.

100.    The Aequitas property is located south of Tucson Street and approximately one-third mile west of Elm Place, just 2 miles southeast of the Subject Property. Surrounding properties are zoned Agricultural, Residential, and Commercial. Portions of the Aequitas property lie within FEMA's 100-year flood plain, as do portions of the Subject Property.

101.    The Planning Commission recommended approval of both applications on July 24, 2025. On August 4, 2025, the City Council approved both applications on its consent agenda, without separate, on-the-record discussion of traffic, floodplain conditions, or land use compatibility. Pickel, Green, and Ford all voted in favor.

## C.  Harvest Church

102.    In 2025, the City Council approved a rezoning application, and later, a conditional use permit for the development of a Christian church, Harvest Church. Like IST,

Harvest Church already operated one location and sought to develop a second location in Broken Arrow. To do so, Harvest Church acquired a second property in the City.

103.    Harvest Church's approximately 90-acre property is located at the northwest corner of New Orleans Street (101st Street), a primary arterial, and 9th Street (177th E. Avenue/Lynn Lane Road). The property is about 5 miles northeast of the Subject Property and approximately one mile from Home Church and Arrow Heights Baptist Church. Surrounding properties are zoned Agricultural and Residential, designated Level 3 or Level 6 under the Comprehensive Plan, and used for single family residences or left vacant. Those conditions are similar to the zoning, planning designations, and surrounding uses of the Subject Property.

104.    In June of 2025, Harvest Church submitted rezoning application BAZ 002238-2025 to change the property's zoning from Agricultural (AG) to Commercial (CG), the same zoning change IST requested. Harvest Church's long-term site plan included a church and commercial space to be developed in a later phase, as did IST's plan.

105.    As it did with the IST's rezoning application, the Planning Commission recommended approval of Harvest Church's rezoning application. On August 4, 2025, Rocky Henkel presented the application to the City Council at a public hearing.

106.    At the August 4 hearing, Ford praised Harvest Church's record of improvements at its existing facility. She did not state that Harvest Church's future commercial phase made Commercial General Zoning premature. This is in contrast to the statements she made after voting to deny IST's applications, where she cited the fact that IST's commercial development would occur in a later phase as a reason for the denial. She

then made the motion to approve the applications. Green and Parks also voted to approve Harvest Church's rezoning application.

107. Harvest Church subsequently submitted conditional use permit application SP 002459 2025 to use the rezoned property as a place of assembly and worship—the same category IST sought. On November 17, 2025, the City Council approved the application on its consent agenda—with Pickel, Green, Ford, Wimpee, and Parks voting in favor. The Council approved the application without separate, on-the-record discussion of whether the proposed religious use was compatible with the Comprehensive Plan or surrounding land uses.

**D. Church on the Move**

108. On February 4, 2025, the City Council approved SP-00184-2024, an amendment to SP-299, allowing Church on the Move, a Christian place of assembly, to expand its existing place of assembly use on property zoned Commercial General and designated Level 6 under the Comprehensive Plan.

109. Church on the Move sought to increase the portion of an existing shopping center devoted to place of assembly use from approximately 24,000 square feet to 33,456 square feet. Like IST, Church on the move therefore sought discretionary land use approval for a religious place of assembly in a Level 6 commercial area.

110. Church on the Move's application presented the same categories of land use concerns the Individual Councilors later invoked against IT. The property abutted Kenosha Street, a primary arterial whose segment between 23rd Street and 9th Street generally had the highest daily traffic count among Broken Arrow arterial streets. Church on the Move also

draws regular traffic, with its existing property hosting religious services on Saturday evenings and Sunday mornings and regular group sessions every day of the week.

111.    On January 16, the Planning Commission recommended approval of SP-00184-2024. The City Council subsequently approved the application through its consent agenda without separate on-the-record deliberation concerning the documented traffic concerns or land use compatibility. Pickel, Green, and Ford voted in favor.

112.    The City Council's approval of these two church's applications adds to the growing number of churches in Broken Arrow. At least 5 churches operate within approximately three miles of the Subject Property—Aspen Creek Church, Assembly Church, Grace Free Will Baptist Church, Walnut Grove Church, and Evergreen Baptist Church—while Broken Arrow does not have a single operating mosque.

## IX.    The City Council Departed from Its Ordinary Practices and Subjected IST to a More Demanding Standard.

113.    The relevant departure was not merely that the Council approved other applications but denied IST's applications—it used unique and more stringent review standards. In other proceedings, the City Council treated unresolved traffic and infrastructure questions as matters that could be addressed through later engineering review, planned roadway improvements, or continued City oversight. For IST, the City Council treated those same categories of issues as grounds for immediate and complete denial.

114.    On July 14, 2025, for example, the City Council approved BAZ-002205-2025, a rezoning request, for the Villas at Battle Creek, a proposed 35-lot residential development. Three nearby residents raised concerns about increased traffic on Aspen Avenue and Omaha Street, and one resident urged the City to widen 51st Street before approving additional development. Council members acknowledged that the road improvements had not yet been

completed but explained that widening the road was a priority in the upcoming 2026 Bond Package and the long-term traffic burden would be reduced. Ford, Pickel, Wimpee, and Green all voted to approve the rezoning request.

115.    The City Council followed the same accommodating approach shortly after denying IST's applications. On February 3, 2026—only 22 days after the IST denial—the City Council approved BAZ 002565-2025 for Oneta 71, LLC, rezoning property from Agricultural to Commercial General for future commercial development. During that hearing, Council members expressed concern that Oneta Road could not accommodate delivery trucks. City staff acknowledged that the traffic impact analysis had not yet undergone complete City engineering review; that the number and location of access points could change; and that deceleration lanes, a left turn lane, and other roadway improvements not shown on the conceptual plan might ultimately be required. A nearby resident also raised concerns about lighting, stormwater, and flooding. The Council nevertheless accepted the applicant's and staff's assurances that traffic, access, roadway, lighting, landscaping, and stormwater issues would be resolved during later review. Pickel, Green, Ford, Wimpee, and Parks voted to approve the rezoning.

116.    The City Council denied IST the same opportunity. City staff and IST's professionals explained that IST's site plan was conceptual, and that traffic, access, parking, stormwater, wastewater, floodplain, and other infrastructure matters would remain subject to platting, site plan review, engineering, permitting, and continued City approval. Yet Pickel, Green, Ford, and Wimpee each voted to deny both IST applications in a single motion rather than allow those matters to be addressed through the same later review processes they accepted for other applicants. Pickel, Green, and Ford had approved Church on the Move

30

despite documented traffic and Comprehensive Plan concerns. Pickel, Green, Ford, and Wimpee approved The Villas at Battle Creek and Oneta 71 while relying on planned roadway improvements or later engineering review. None identified any material reason why those processes were adequate for the Christian and secular applicants but inadequate for IST.

117. The City Council also denied IST's applications in full, without using its authority to approve the applications with certain conditions or send them back to the Planning Commission for further analysis. These alternative, less restrictive measures would have ensured that any legitimate traffic or flooding concerns would be mitigated without outright denial of the applications. The City Council forewent these less stringent measures in favor of a full and immediate denial.

118. This selective departure from the City's ordinary approach, following intense public pressure and the Councilors' own statements of hostility towards Islam, supports the inference that the stated land use and infrastructure concerns were pretextual and that IST was subjected to heightened scrutiny because of its religion.

## X. The Denial Has Caused Concrete, Ongoing Harm and Impaired IST's Religious Exercise.

119. The City's denial, effected through the votes of Pickel, Green, Ford, and Wimpee, remains in force and prevents IST from proceeding with the platting, engineering, permitting, construction, and religious use of the Subject Property as a mosque and Islamic community center. IST therefore cannot use the Subject Property for its intended religious purposes, including congregational prayer, religious education, charitable services, community services, and other religious exercise. Because Broken Arrow has no mosque, the denial also leaves Muslim residents without a place of Islamic worship within the City.

120.    Without a mosque in Broken Arrow, many Muslim residents must travel to IST's existing Tulsa mosque to participate in congregational worship. The Tulsa Mosque is already over capacity, and some worshippers are unable to attend Friday services because they cannot find a parking space. By preventing construction of the proposed Broken Arrow Mosque, the denial perpetuates that overcrowding and materially restricts IST's ability to serve its religious community.

121.    IST has also suffered financial injury. IST invested significant funds in acquiring and preparing the Subject Property and pursuing the rezoning and conditional use permit applications, reasonably anticipating that the applications would be evaluated under the same standards and ordinary processes applied to other applicants. The denial has frustrated those expenditures, deprived IST of the intended religious use of its property, delayed the proposed development, and prolonged the period during which IST owns property and must pay for its upkeep even though it cannot use the land for its intended religious purpose.

122.    The denial has also impaired IST's religious mission and inflicted emotional and dignitary harm on IST's members and the Muslim community it serves. In the context of public opposition attacking Islam, Muslims, Sharia, and the proposed mosque, the City's denial conveyed that Islamic worship and Muslim religious institutions are unwelcome in Broken Arrow.

**XI.    The U.S. Department of Justice is Actively Investigation Broken Arrow for its denial of IST's applications.**

123.    On July 28, 2026, the City of Broken Arrow publicly announced that the U.S. Department of Justice opened an investigation into the City for possible RLUIPA violations regarding the denial of IST's applications.

124.    The City Council announced that it would convene a confidential meeting to discuss the investigation on August 3, 2026. The investigation remains open and ongoing.

## CLAIMS

### Count I

**Violation of Religious Land Use and Institutionalized Persons Act**
*Equal Terms Provision, 42 U.S.C. § 2000cc(b)(1)*

**Against Defendant City of Broken Arrow, Oklahoma**

125.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

126.    IST is a religious assembly or institution within the meaning of RLUIPA. In processing and denying IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025, the City imposed and implemented its Zoning Ordinance in a manner that treated IST on less than equal terms with similarly situated non-religious assemblies or institutions.

127.    RLUIPA forbids a government from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

128.    In *Rocky Mountain Christian Church v. Bd. of County Commissioners*, the Tenth Circuit upheld an Equal Terms violation where the evidence permitted a finding that the government treated a religious institution "less favorably in processing, determining, and deciding" its land use application than it treated a similarly situated nonreligious institution. *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs*, 613 F.3d 1229, 1236–37 (10th Cir. 2010).

129.    Whether a religious institution and a secular comparator are similarly situated under RLUIPA is a fact-specific question. *Roman Cath. Archdiocese of Kansas City in Kansas v. City of Mission Woods*, 337 F. Supp. 3d 1122, 1141 (D. Kan. 2018). Relevant factors may include whether the entities are similar in size and capacity, whether they are governed by the same zoning ordinance and district, and whether they have comparable community impacts. *See Rocky Mountain Christian Church*, 613 F.3d at 1236-37; *Konikov v. Orange County*, 410 F.3d 1317, 1327 (11th Cir.2005); *Roman Cath. Archdiocese of Kansas City*, 337 F. Supp. 3d at 1141-42.

130.    The City of Broken Arrow treated IST less favorably than secular entity, Aspen Creek Villas. On May 19, 2026, Defendants approved Aspen Creek Villas' applications for a planned 350-unit residential development. IST and Aspen Creek Villas were both governed by the Broken Arrow Zoning Ordinance, located near Olive Avenue, expected to generate an increase in traffic, and recommended for approval by the Planning Commission. Ford, Wimpee, Pickel, and Green considered both matters within five months of each other. IST and Aspen Creek Villas are thus "similarly situated" with respect to the land use concerns at issue. *See Rocky Mountain Christian Church*, 613 F.3d at 1236–37.

131.    Despite these similarities, the City treated IST and Aspen Creek Villas differently. The City considered and relied on traffic concerns, including congestion along Olive Avenue, in denying IST's applications. The City nevertheless approved Aspen Creek Villas' applications despite comparable traffic concerns. The City also followed the Planning Commission's recommendation for Aspen Creek Villas, but rejected the Planning Commission's recommendation for IST. The City thus treated IST on less than equal terms than Aspen Creek Villas, a secular development.

132.   The City also treated IST less favorably than Aequitas, another secular development, involving comparable applications and property characteristics. Both properties were governed by the Broken Arrow Zoning Ordinance. Both involved property zoned Agricultural and requests for commercial zoning. Both properties were surrounded by Agricultural and Residential uses, located near Tucson Street, and partially situated within FEMA's 100-year floodplain. The Planning Commission recommended approval of both matters, and the applications were considered within six months of one another. IST and Aequitas are thus "similarly situated" with respect to the land use concerns at issue. *See Rocky Mountain Christian Church*, 613 F.3d at 1236–37.

133.   Despite these similarities, the City treated IST and Aequitas differently. The City invoked traffic and flooding concerns in connection with IST's applications, but the City Council approved the Aequitas applications without deliberating traffic or flooding concerns. The City also followed the Planning Commission's recommendation for Aequitas but rejected the Planning Commission's recommendation for IST. The City therefore treated IST less favorably than Aequitas.

134.   In sum, the City treated IST less favorably in processing, determining, and deciding its applications than it treated the similarly situated comparators identified above. *See Rocky Mountain Christian Church*, 613 F.3d at 1236–37. By doing so, the City violated RLUIPA's Equal Terms Provision. 42 U.S.C. § 2000cc(b)(1).

135.   IST is thus entitled to a declaration that the City's denial of IST's rezoning and conditional use permit applications, which the Broken Arrow Planning Commission recommended for approval, violated RLUIPA's Equal Terms provision.

35

136.    IST is entitled to issuance of an injunction enjoining the City from enforcing or giving effect to its denial of IST's applications and requiring the City to take whatever actions necessary to permit IST to use the Subject Property for the intended religious uses proposed in those applications.

**Count II**

**Violation of Religious Land Use and Institutionalized Persons Act**
*Nondiscrimination Provision, 42 U.S.C. § 2000cc(b)(2)*

**Against Defendant City of Broken Arrow, Oklahoma**

137.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

138.    IST is an Islamic religious assembly and institution within the meaning of RLUIPA. In imposing and implementing its Zoning Ordinance and denying rezoning application BAZ-002469-2025 and conditional use permit application SP-002526-2025, the City intentionally discriminated against IST on the basis of religion and religious denomination.

139.    RLUIPA forbids a government from "impos[ing] or implement[ing] a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). "Congress passed RLUIPA upon finding that local zoning boards would use 'vague and universally applicable reasons,' such as traffic or aesthetics, to contrive widespread discrimination on the basis of religion." *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 341 (D.N.J. 2016) (citing 146 Cong. Rec. S7, 774–01, (daily ed. July 27, 2000) (joint statement of Sens. Hatch & Kennedy), 2000 WL 1079346, at *S7774).

36

140.    A government violates RLUIPA's Nondiscrimination Provision when discriminatory intent is at least a motivating factor in the imposition or implementation of a land use regulation. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014). Unlike an Equal Terms claim, a Nondiscrimination claim does not require proof of a similarly situated comparator.

141.    Determining whether discriminatory intent motivated a land use decision requires a sensitive inquiry into the available facts. Discriminatory intent may be established through direct or circumstantial evidence, including statements reflecting religious hostility, differential treatment of secular or religious groups, and the circumstances surrounding and sequence of events leading up to the challenged decision. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland*, 915 F.3d 256, 262–63 (4th Cir. 2019), as amended (Feb. 25, 2019); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977); *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 653-54 (10th Cir. 2006); *Roman Cath. Archdiocese of Kansas City*, 337 F. Supp. 3d at 1147. Procedural departures are particularly probative of discrimination when the factors ordinarily considered important strongly favor a result contrary to the one reached. *Jesus Christ Is the Answer Ministries, Inc*, 915 F.3d at 267.

142.    A government decision influenced by community members' religious bias is unlawful even when government decisionmakers do not expressly adopt or personally display that bias. *Jesus Christ Is the Answer Ministries, Inc*, 915 F.3d at 263 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) and *Marks v. City of Chesapeake*, 883 F.2d 308, 311–13 (4th Cir. 1989)). Such influence may reasonably be inferred where expressions of community hostility are followed by irregularities in government decision-making. *Id.* (citing

37

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982)). At the pleading stage, IST need not disprove every facially neutral explanation for the denial; it need only allege facts supporting a plausible inference that religious discrimination was a motivating factor.

143. The totality of the circumstances supports a plausible inference that the City denied IST's applications because IST is a Muslim religious institution seeking to construct a mosque. Those circumstances include the government's own hostile statements toward Islam; intense public hostility toward Islam and the proposed mosque; the political and electoral pressure directed at the City Council; the Council's procedural and substantive departures; the heightened scrutiny applied to IST's conceptual plans; the materially more favorable treatment afforded to Christian and secular applicants; the recommendations for approval from City staff and the Planning Commission; and the generalized and inconsistent reasons offered for the denial.

144. First, at least two Council members, Wimpee and Ford, expressed hostility towards Islam and Muslims in their communications regarding the IST applications. Wimpee stated she shared resident concerns about Muslims building a mosque in their neighborhood because Muslims are violent. Ford stated she agreed with a resident's concerns that Muslims sought to take over the City.

145. Second, the City Council applied irregular standards and procedures in their decision-making process. For example, the City Council combined IST rezoning and conditional use permit applications in a single motion and vote, although the Zoning Ordinance directs them to do the opposite. No Individual Councilor distinguished between the applications, identified an application-specific criterion that IST failed to satisfy, or made separate findings under the standards governing each application.

146. Third, the City subjected IST to heightened and unequal scrutiny by treating engineering and infrastructure matters addressed later on in the process as grounds for denying zoning and conditional use approval. City staff and IST's professionals explained that traffic, access, parking, stormwater, wastewater, floodplain, and related infrastructure matters would be addressed through the City's later platting, site plan, engineering, and permitting processes. The City nevertheless relied on those matters to deny IST's applications. In other proceedings, the City approved applications presenting traffic and infrastructure concerns on the understanding that those matters could be addressed during later engineering review, through conditions, or through planned roadway improvements.

147. Fourth, the City's materially more favorable treatment of Harvest Church supports the inference of religious discrimination. Just months before denying IST's applications, the City approved Harvest Church's request to rezone property from Agricultural to Commercial General and later approved its request for conditional use permit to use the property as a Christian place of assembly and worship. Like IST's proposal, the Harvest Church's development included a religious place of assembly and a commercial component to be developed in a later phase, was located by a primary arterial, and had similar surrounding districts and uses. Ford moved to approve Harvest Church's rezoning application, and Pickel and Green voted in favor. The City approved Harvest Church notwithstanding its future commercial component, but Ford later identified the fact that IST's commercial component would be developed in a future phase as a reason for denying IST's applications. The City has provided no religion-neutral explanation for treating that feature as acceptable for Harvest Church but objectionable for IST. This differential treatment of Muslim and Christian religious institutions is evidence of discriminatory intent.

148.     Fifth, the City denied IST's rezoning application despite the factors strongly favoring a decision contrary. City staff concluded that the requested Commercial General zoning complied with the Comprehensive Plan, that a place of assembly was allowed with a conditional use permit, and that the remaining technical issues would be addressed during later City review. Staff recommended approval of both applications. The City Council nevertheless denied both applications without identifying a particular rezoning or conditional use criterion that IST failed to satisfy. That substantive departure from the City's own professional land use analysis supports an inference of discriminatory intent. *See Vill. of Arlington Heights,* 429 U.S. at 267 (stating discriminatory intent may be inferred where factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached).

149.     Finally, the City's deviation from normal procedures following overwhelming public pressure directed specifically against Islam, Muslims, Sharia, mosques, and the presence of a Muslim religious institution in Broken Arrow supports the inference that the City's deviations were motivated by religious discrimination. *See Smith*, 682 F.2d at 1066 (stating that discriminatory influence may be inferred where expressions of community bias are followed by irregularities in government decision-making). Dozens of speakers urged the Council to represent the views of opponents and deny IST's applications. Some stated that Islam is incompatible with American society and the U.S. constitution, characterized Islamic doctrine as dangerous, or associated Islam and IST with terrorism. The Council heard those objections and then departed from its ordinary procedures, briefly deliberated, combined the two applications in one motion, and denied both without application-specific findings. The close sequence between the expressions of religious hostility and the irregular decision-

making supports the inference that the City discriminated against IST. *See Vill. of Arlington Heights,* 429 U.S. at 267.

150.    Intentional religious discrimination is not a legitimate governmental objective. Even assuming the City may invoke a strict scrutiny defense to its discriminatory application of the Zoning Ordinance, the outright denial of both applications was neither narrowly tailored nor the least restrictive means of addressing any legitimate traffic, flooding, parking, infrastructure, or land use concern. The City could have imposed appropriate conditions or required IST to address those matters during the ordinary engineering, platting, site plan, and permitting processes, as City staff recommended and as the City had done for other applicants. IST also accepted the Planning Commission's condition prohibiting outdoor speakers. Rather than employ those available measures, the City outright denied both applications.

151.    IST is thus entitled to a declaration that the City's January 12, 2026, denial of BAZ-002469-2025 and SP-002526-2025 discriminated against IST on the basis of IST's religion and violated RLUIPA's Nondiscrimination Provision. 42 U.S.C. § 2000cc(b)(2).

152.    IST is entitled to issuance of an injunction enjoining the City from enforcing or giving effect to its January 12, 2026, denial and requiring the City to approve BAZ-002469-2025 and SP-002526-2025 as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory post-approval requirements.

**Count III**

**Violation of Religious Land Use and Institutionalized Persons Act**
*Substantial Burden Provision, 42 U.S.C. § 2000cc(a)*

**Against Defendant City of Broken Arrow, Oklahoma**

153.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

154.    IST's construction and use of the Subject Property as a mosque and Islamic community center for congregational prayer, worship, religious education, charitable services, community services, and other religious activities constitute religious exercise within the meaning of RLUIPA. IST seeks to engage in that religious exercise pursuant to its sincerely held religious beliefs. By imposing and implementing its Zoning Ordinance through the final denial of rezoning application BAZ-002469-2025 and conditional use permit application SP-002526-2025, the City imposed a substantial burden on IST's religious exercise.

155.    RLUIPA provides that no government may impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, assembly, or institution unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc(a)(1). The provision applies when, as here, the government implements a land use regulatory system that permits individualized assessments of proposed property uses. 42 U.S.C. § 2000cc(a)(2)(C).

156.    "[T]to prevail on a claim under the substantial burden provision, a plaintiff must first demonstrate that the regulation at issue actually imposes a substantial burden on religious exercise." *Grace Church*, 742 F. at 1162 (quoting *Civil Liberties For Urban Believers v.*

*City of Chicago*, 342 F.3d 752, 769 (7th Cir.2003) ("C.L.U.B.")). RLUIPA differs from the Free Exercise Clause because its definition of "religious exercise" is not limited to religious activities that are "fundamental" or central to a system of religious belief. *Grace Church*, 742 F. Supp. 2d at 1162-63 (citing *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 663 (10th Cir. 2006) (recognizing that the district court erred in requiring the burdened religious activities to be "fundamental"); 42 U.S.C. § 2000cc–5(7)(A). Rather, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc–5(7)(B). Under RLUIPA, the denial of a land use application that prevents a religious entity from assembling or engaging in its religious practices within the county or city may pose a substantial burden. *See Grace Church*, 742 F. Supp. 2d at 1163. Additionally, a land use decision that treats a religious entity in a discriminatory manner that pressures it to forego religious conduct may also impose a substantial burden. *Id*.

157.    The City's denial imposes substantially more than a mere inconvenience on IST. It prevents IST from proceeding with the construction and use of the Subject Property as the mosque and Islamic community center proposed in its applications. Broken Arrow has no mosque, and many Muslim residents must travel to IST's existing Tulsa Mosque to participate in religious practice. The facility is already overcrowded, and some worshippers are unable to attend Friday services because they cannot obtain parking. The denial prevents IST from using the Subject Property to relieve those existing limitations and to provide congregational prayer, worship, religious education, charitable services, and other religious programming within Broken Arrow. IST also had a reasonable expectation that it could use the Subject

Property for the proposed religious exercise. The Subject Property's Level 6 designation supported the requested Commercial General zoning; City staff concluded that the rezoning complied with the Comprehensive Plan and that a place of assembly was allowed with a conditional use permit; staff recommended approval of both applications; the Planning Commission recommended approval of both applications; and IST accepted the Commission's condition prohibiting outdoor speakers. The City nevertheless denied both applications outright. The denial therefore directly inhibits IST's demonstrated need and ability to establish the proposed mosque and Islamic community center on property acquired and prepared for that religious purpose.

158.    Once IST establishes that the City imposed a substantial burden, the City bears the burden of demonstrating that its particular denial furthered a compelling governmental interest and was the least restrictive means of furthering that interest. 42 U.S.C. §§ 2000cc(a)(1), 2000cc-2(b). The City cannot satisfy that burden because even if the City had a compelling interest regarding traffic or flooding concerns, it did not employ the least restrictive means of furthering that interest. City staff advised that any traffic, access, parking, stormwater, wastewater, floodplain, and other infrastructure matters would be addressed through platting, site plan review, engineering, permitting, and continued City oversight. The Planning Commission recommended approval subject to a prohibition on outdoor speakers, which IST accepted. The City could have imposed appropriate conditions and required compliance through those ordinary later review processes. The City also could have sent the applications back to the Planning Commission for further analysis. Instead, it denied both applications in full and outright without explaining why those less restrictive measures would

be inadequate. The denial was therefore not the least restrictive means of furthering any compelling governmental interest.

159.   IST is entitled to a declaration that the City's January 12, 2026 denial of BAZ-002469-2025 and SP-002526-2025 imposed a substantial burden on IST's religious exercise, is not justified by a compelling government interest, and is in violation of RLUIPA.

160.   IST is entitled to issuance of permanent injunctive relief enjoining the City from enforcing or giving effect to its January 12, 2026 denial and requiring the City to approve BAZ-002469-2025 and SP-002526-2025 as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory platting, site plan, engineering, permitting, and other post-approval requirements.

**Count IV**

**Violation of 42 U.S.C. § 1983**
**First and Fourteenth Amendments to the United States Constitution**
*Free Exercise Clause*

**Against Defendant City of Broken Arrow, Oklahoma and Pickel, Green, Ford and Wimpee in Their Individual Capacities**

161.   Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

162.   IST asserts this claim under 42 U.S.C. § 1983 against the City and against Pickel, Green, Ford, and Wimpee in their individual capacities. The City Council was the City's final policymaker for the applications, and its denial constituted official City policy. Each Individual Councilor acted under color of state law and personally participated in the challenged decision. Green moved to deny both applications and voted for the denial, and Pickel, Ford, and Wimpee each joined in voting for the denial.

45

163.    The Free Exercise Clause of the First Amendment, applicable to state and local governments through the Fourteenth Amendment, prohibits the government from burdening religious exercise through laws or governmental actions that are not neutral and generally applicable. Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs, restricts conduct because of its religious nature, or discriminatorily applies an otherwise facially neutral rule. Governmental action that burdens religious exercise and is not neutral or generally applicable is subject to strict scrutiny and must be narrowly tailored to advance a compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *Fulton v. City of Philadelphia, Pennsylvania,* 593 U.S. 522, 524 (2021); *Grace United Methodist*, 451 F.3d at 649.

164.    The City of Broken Arrow, acting by and through the Broken Arrow City Council and its members, violated and continue to violate IST's rights under the Free Exercise Clause by imposing a substantial burden upon the religious exercise of IST and by intentionally discriminating against IST on the basis of religious belief. The substantial burden has been imposed by the discriminatory and arbitrary denial of IST's application for rezoning and a conditional use permit, and through the discretionary enforcement of a system of regulations that allows for individualized assessments of land use proposals.

165.    IST's proposed construction and use of the Subject Property as a mosque and Islamic community center for congregational prayer, worship, religious education, charitable services, community services, and other religious activities constitute religious exercise protected by the Free Exercise Clause. Defendants applied the City's discretionary land use process to that religious exercise in a nonneutral and discriminatory manner. Among other things:

a. Defendants Wimpee and Ford made written statements expressing hostility towards Islam and Muslims in relation to IST's applications;

b. Defendants acted after sustained public opposition directed specifically at Islam, Muslims, Sharia, mosques, and the presence of an Islamic institution in Broken Arrow;

c. City staff found that IST's requested rezoning complied with all requirements, and that remaining engineering and infrastructure matters would be addressed through the City's ordinary later-review processes;

d. The Planning Commission recommended approval of the rezoning and conditional use permit applications;

e. Defendants combined IST's rezoning and conditional use permit applications in one motion and vote even though the applications were governed by different standards and required separate decisions;

f. Defendants deliberated for only two minutes and denied both applications without identifying an application-specific criterion that IST failed to satisfy;

g. Defendants subjected IST's conceptual plans to heightened scrutiny concerning traffic, parking, flooding, and infrastructure, even though City staff explained that those matters would ordinarily be addressed through later engineering, platting, site plan, and permitting review;

h. Defendants rejected City staff's recommendation to approve both applications and the Planning Commission's recommendations for approval without identifying a material deficiency under the governing standards;

i. Defendants treated unresolved traffic, parking, flooding, stormwater, wastewater, access, and infrastructure matters as grounds for denying IST's applications even though Defendants permitted other applicants to address comparable matters during later phases;

47

j.  The City approved Harvest Church's Agricultural to Commercial General rezoning and later approved its permit for a Christian place of assembly, notwithstanding its future commercial phase, while Ford later cited IST's future commercial phase as a reason for denying IST; and

k.  The City approved Church on the Move's expansion of a Christian place of assembly use despite documented traffic and Comprehensive Plan concerns, while applying materially more demanding scrutiny to IST's proposed Islamic place of assembly.

These circumstances support the inference that IST's Islamic identity and its proposed use of the Subject Property as a mosque were substantial and motivating factors in the denial and that IST's applications would not have been denied absent Defendants' discriminatory treatment of its religious exercise.

166.  The denial directly and substantially burdens IST's religious exercise. It prevents IST from proceeding with the development of the mosque and Islamic community center proposed in its applications. It prevents IST from conducting congregational prayer, worship, religious education, charitable services, community services, and other religious activities at the Subject Property. The City continues to give effect to the denial, and the resulting restriction of IST's religious exercise remains ongoing.

167.  Defendants' nonneutral and discriminatory denial cannot survive strict scrutiny. Even assuming that traffic, parking, flooding, wastewater, infrastructure, and land use compatibility are compelling governmental interests as applied to IST's particular applications, outright denial of both applications was not narrowly tailored to advance those interests. Technical concerns could have been addressed through later stages of development, and the Council could have placed conditions on approval, as did the Planning Commission.

Defendants did not identify any reason why those less restrictive measures were inadequate for IST but were adequate for other applicants.

168. By January 12, 2026, it was clearly established that government officials could not intentionally discriminate against religious exercise, apply facially neutral rules with hostility toward religion, or deny a religious applicant the neutral consideration afforded to others. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533-35; *Fulton,* 593 U.S. at 533–34; *Grace United Methodist Church*, 451 F.3d at 649.

169. IST is entitled to a declaration that Defendants' denial of BAZ-002469-2025 and SP-002526-2025 violated IST's rights under the Free Exercise Clause of the First Amendment, as incorporated through the Fourteenth Amendment.

170. IST is entitled to issuance of an injunction enjoining the City from enforcing or giving effect to its January 12, 2026 denial and requiring the City to approve the applications as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory post-approval requirements.

### Count V

**Violation of 42 U.S.C. § 1983**
**Violation of the First and Fourteenth Amendments to the United States Constitution**
*Establishment Clause*

**Against Defendant City of Broken Arrow, Oklahoma and Pickel, Green, Ford and Wimpee in Their Individual Capacities**

171. Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

172. IST asserts this claim under 42 U.S.C. § 1983 against the City and against Pickel, Green, Ford, and Wimpee in their individual capacities. The City Council was the

City's final policymaker for the applications, and its denial constituted official City policy. Each Individual Councilor acted under color of state law and personally participated in the challenged decision. Green moved to deny both applications and voted for the denial, and Pickel, Ford, and Wimpee each joined in voting for the denial.

173.    The Establishment Clause of the First Amendment, applicable to state and local governments through the Fourteenth Amendment, requires governmental neutrality among religions. Its clearest command is that government may not officially prefer one religious denomination over another. *Larson v. Valente*, 456 U.S. 228, 244 (1982). When a law or its application creates a denominational preference, "courts must 'treat the law as suspect' and apply 'strict scrutiny in adjudging its constitutionality.'" *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238, 248 (2025) (quoting *Larson v. Valente*, 456 U.S. at 246). The government bears the burden of demonstrating that the challenged application is "closely fitted to further a compelling governmental interest." *Id.*

174.    Defendants imposed and implemented the City's Zoning Ordinance in a manner that preferred Christian religious institutions over IST, an Islamic religious institution. The City Council approved Harvest Church's request to rezone property from Agricultural to Commercial General and later approved its application to use that property as a Christian place of assembly and worship. Ford moved to approve Harvest Church's rezoning application, and Pickel and Green voted in favor. Pickel, Green, Ford, and Wimpee later voted to approve Harvest Church's place of assembly permit. Pickel, Green, and Ford also voted to approve Church on the Move's application to expand its Christian place of assembly use. Defendants afforded IST materially different treatment. All four Individual Councilors voted to deny IST's request to rezone its property from Agricultural to

Commercial General and its conditional use permit for an Islamic place of assembly. The City approved Harvest Church's rezoning despite its future commercial component but later cited IST's future commercial phase as a reason for denying IST's applications. Defendants subjected IST to heightened scrutiny, departed from the City's ordinary procedures, combined IST's two applications in a single vote, and denied both without application-specific findings. By applying the City's land use authority more favorably to Christian religious institutions and more restrictively to IST, and by giving effect to sectarian opposition to an Islamic institution, Defendants created an official, as-applied denominational preference favoring Christian religious institutions over Islam.

175.    Defendants' denominational preference cannot survive strict scrutiny. No compelling governmental interest permits the City to afford Christian institutions more favorable land use treatment than Islamic institutions. Traffic, flooding, parking, infrastructure, and compatibility concerns may be evaluated through neutral land use standards, but they do not justify applying those standards differently because of religious denomination. Nor was the outright denial of both IST applications narrowly tailored to any asserted interest when the City could have used conditions and its ordinary post-approval review processes.

176.    By January 12, 2026, it was clearly established that government officials could not intentionally discriminate against religious exercise, apply facially neutral rules with hostility toward religion, or deny a religious applicant the neutral consideration afforded to others. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533-35; *Fulton,* 593 U.S. at 533–34; *Grace United Methodist Church*, 451 F.3d at 649.

177.   Defendants have deprived and continue to deprive IST of its right to governmental neutrality among religions, in violation of the Establishment Clause to the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment, by implementing the Zoning Ordinance in a manner that discriminates against IST because it is an Islamic religious institution and creates an impermissible denominational preference favoring Christian religious institutions over IST.

178.   IST is entitled to a declaration that Defendants' denial of BAZ-002469-2025 and SP-002526-2025 created an unconstitutional denominational preference and violated the Establishment Clause of the First Amendment, as incorporated through the Fourteenth Amendment.

179.   IST is entitled to issuance of an injunction enjoining the City from enforcing or giving effect to the January 12, 2026 denial and requiring the City to approve the applications as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory post-approval requirements.

## Count VI

**Violation of 42 U.S.C. § 1983**
**Fourteenth Amendment to the United States Constitution**
*Equal Protection*

**Against Defendant City of Broken Arrow, Oklahoma and Pickel, Green, Ford and Wimpee in Their Individual Capacities**

180.   Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

52

181.    IST asserts this claim under 42 U.S.C. § 1983 against the City and against Pickel, Green, Ford, and Wimpee in their individual capacities. The City Council was the City's final policymaker for the applications, and its denial constituted official City policy. Each Individual Councilor acted under color of state law and personally participated in the challenged decision. Green moved to deny both applications and voted for the denial, and Pickel, Ford, and Wimpee each joined in voting for the denial.

182.    The Equal Protection Clause of the Fourteenth Amendment requires state and local governments to treat similarly situated persons and institutions alike and prohibits purposeful discrimination based on religion. A plaintiff asserting religion-based discrimination must allege that the government acted, at least in part, because of the plaintiff's religion and subjected the plaintiff to adverse treatment as a result. Discriminatory purpose may be established through direct evidence or inferred from the totality of the circumstances, including the sequence of events preceding the decision, departures from ordinary procedures, substantive departures from the factors ordinarily considered important, and contemporary statements. *Village of Arlington Heights,* 429 U.S. at 564-65. Governmental discrimination based on religion is subject to strict scrutiny.

183.    The totality of the circumstances supports the inference that IST's Islamic identity and its proposed use of the Subject Property as a mosque were substantial and motivating factors in Defendants' decision. Among other things:

    a. Defendants Wimpee and Ford made written statements expressing hostility towards Islam and Muslims in relation to IST's applications;

    b. Defendants acted after sustained public opposition directed specifically at Islam, Muslims, Sharia, mosques, and the presence of an Islamic institution in Broken Arrow;

c. City staff found that IST's requested rezoning complied with all requirements, and that remaining engineering and infrastructure matters would be addressed through the City's ordinary later-review processes;

d. The Planning Commission recommended approval of the rezoning and conditional use permit applications;

e. Defendants combined IST's rezoning and conditional use permit applications in one motion and vote even though the applications were governed by different standards and required separate decisions;

f. Defendants deliberated for only two minutes and denied both applications without identifying an application-specific criterion that IST failed to satisfy;

g. Defendants subjected IST's conceptual plans to heightened scrutiny concerning traffic, parking, flooding, and infrastructure, even though City staff explained that those matters would ordinarily be addressed through later engineering, platting, site plan, and permitting review;

h. Defendants rejected City staff's recommendation to approve both applications and the Planning Commission's recommendations for approval without identifying a material deficiency under the governing standards;

i. Defendants treated unresolved traffic, parking, flooding, stormwater, wastewater, access, and infrastructure matters as grounds for denying IST's applications even though Defendants permitted other applicants to address comparable matters during later phases;

j. The City approved Harvest Church's Agricultural to Commercial General rezoning and later approved its permit for a Christian place of assembly, notwithstanding its future commercial phase, while Ford later cited IST's future commercial phase as a reason for denying IST; and

k. The City approved Church on the Move's expansion of a Christian place of assembly use despite documented traffic and Comprehensive Plan concerns, while applying materially more demanding scrutiny to IST's proposed Islamic place of assembly.

184. These allegations support the inference that Defendants selected and implemented the challenged course of action because of, and not merely in spite of, IST's religion, and that IST would have received materially more favorable treatment had it not been an Islamic institution.

185. By January 12, 2026, it was clearly established that government officials could not intentionally discriminate against religious exercise, apply facially neutral rules with hostility toward religion, or deny a religious applicant the neutral consideration afforded to others. *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533-35; *Fulton,* 593 U.S. at 533–34; *Grace United Methodist Church*, 451 F.3d at 649.

186. Defendants' religion-based differential treatment cannot survive strict scrutiny. No compelling governmental interest permits state or local officials to discriminate against an applicant because it is Muslim or because it seeks to construct a mosque. Even assuming that traffic, flooding, parking, wastewater, infrastructure, and land use compatibility constitute compelling governmental interests in the abstract, the outright denial of both applications was not narrowly tailored to address those interests. . Technical concerns could have been addressed through later stages of development, and the Council could have placed conditions on approval, as did the Planning Commission. Defendants did not explain why those ordinary measures were adequate for Christian and secular applicants but inadequate for IST.

187. Defendants have deprived and continue to deprive IST of its right to equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth

Amendment, by implementing the Zoning Ordinance in a manner that intentionally discriminates against IST on the basis of religion and subjects IST to less favorable treatment than similarly situated Christian religious institutions and secular applicants.

188.    IST is entitled to a declaration that Defendants' denial of BAZ-002469-2025 and SP-002526-2025 discriminated against IST on the basis of religion and violated the Equal Protection Clause of the First Amendment, as incorporated through the Fourteenth Amendment.

189.    IST is entitled to issuance of permanent injunction enjoining the City from enforcing or giving effect to the January 12, 2026 denial and requiring the City to approve the applications as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory post-approval requirements.

### Count VII

### Violation of the Oklahoma Religious Freedom Act
### 51 O.S. §§ 251-258

**Against Defendant City of Broken Arrow, Oklahoma and Pickel, Green, Ford and Wimpee in Their Individual Capacities**

190.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

191.    The Oklahoma Religious Freedom Act ("ORFA") mandates that no governmental entity shall substantially burden a person's free exercise of religion, even if the burden results from a rule of general applicability, unless the governmental entity demonstrates that application of the burden is essential to further a compelling government

interest and is the least restrictive means of furthering that interest. Okla. Stat. 51, § 253; *Beach v. Oklahoma Dep't of Pub. Safety*, 2017 OK 40, ¶ 12, 398 P.3d 1, 5-6.

192.    ORFA further provides that a governmental entity "demonstrates" its compelling interest and least restrictive means defense only through clear and convincing evidence. 51 O.S. § 252(1).

193.    The City is a political subdivision and governmental entity within the meaning of ORFA. ORFA defines "governmental entity" to include a political subdivision of the State and "any official or other person acting under color of state law." 51 O.S. § 252(5).

194.    Councilors Pickel, Green, Ford, and Wimpee were officials acting under color of state law and are also governmental entities within the statutory definition. IST asserts this claim against each Individual Councilor based on his or her personal participation in the challenged denial.

195.    A governmental entity substantially burdens a plaintiff's free exercise of religion under ORFA where: 1) it "[s]ignificantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a [person's] individual beliefs;" 2) it "meaningfully curtail[s] a [person's] ability to express adherence to his or her faith;" or 3) it denies "reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." Okla. Stat. 51, § 252(7); *Griffith v. Caney Valley Pub. Schs.*, No. 15-CV-273-GKF-FHM, 2015 WL 2451226, at *5 (N.D. Okla. May 21, 2015).

196.    Defendants substantially burdened IST's free exercise of religion. IST acquired and intends to use the Subject Property to construct and operate a mosque and Islamic community center for religiously activities. Defendants' final denial prevents IST from proceeding with the development and religious use of the Subject Property for those purposes.

The burden is actual, direct, and ongoing. Broken Arrow has no mosque, and IST's existing Tulsa Mosque is insufficient to meet the needs of the Muslim community. By preventing IST from constructing and operating the proposed Broken Arrow mosque, Defendants have inhibited and curtailed IST's ability to conduct its religiously motivated practices and to serve the Muslim community for which the proposed facility was intended.

197.    Defendants cannot demonstrate by clear and convincing evidence that the outright denial of both applications was essential to further a compelling governmental interest or was the least restrictive means of furthering any such interest. Technical concerns could have been addressed through later stages of development, and the Council could have placed conditions on approval, as did the Planning Commission. The denial was therefore not the least restrictive means of furthering any compelling governmental interest.

198.    ORFA preserves ordinary zoning authority for municipalities only when that authority is exercised in a nondiscriminatory manner consistent with the Act. 51 O.S. § 258.

199.    IST is entitled to a declaration that Defendants' denial of BAZ-002469-2025 and SP-002526-2025 substantially burdened IST's free exercise of religion, was not essential to further a compelling governmental interest, was not the least restrictive means of furthering any such interest, and violated ORFA.

200.    IST is entitled to issuance of permanent injunction enjoining the City from enforcing or giving effect to the January 12, 2026 denial and requiring the City to approve the applications as recommended by City staff and the Planning Commission, subject to the no-outdoor-speaker condition accepted by IST as well as the City's ordinary, neutral, and nondiscriminatory post-approval requirements.

201.    IST also seeks monetary damages against Defendants as authorized by 51 O.S. § 256(A), together with reasonable costs and attorneys' fees under 51 O.S. § 256(B).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court enter judgment in its favor and against each Defendant on the Counts applicable to that Defendant, and grant the following relief:

202.    Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that:

a.  the City's January 12, 2026 denial of IST's rezoning application, BAZ-002469-2025, and conditional use permit application, SP-002526-2025, violated the Equal Terms, Nondiscrimination, and Substantial Burden provisions of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc(a), 2000cc(b)(1), and 2000cc(b)(2);

b.  the actions of the City and the Individual Councilors violated IST's rights under the Free Exercise and Establishment Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, enforceable through 42 U.S.C. § 1983;

c.  the actions of the City and the Individual Councilors violated the Oklahoma Religious Freedom Act, 51 O.S. §§ 251–258; and

d.  the City's January 12, 2026, denial of BAZ-002469-2025 and SP-002526-2025 is unlawful, invalid, and unenforceable and may not be given further force or effect.

203. Grant permanent injunctive relief:

    a. enjoining the City from enforcing or otherwise giving effect to the January 12, 2026, denial of BAZ-002469-2025 and SP-002526-2025;

    b. requiring the City to approve BAZ-002469-2025 and SP-002526-2025 consistent with the recommendations of City staff and the Broken Arrow Planning Commission, subject to the no-outdoor-speaker condition accepted by IST;

    c. requiring the City to adopt, issue, execute, record, and deliver all ordinances, resolutions, permits, approvals, and other documents necessary to place the Commercial General zoning and conditional use permit into effect;

    d. requiring the City promptly and in good faith to accept, review, and process all subsequent platting, site plan, engineering, infrastructure, stormwater, wastewater, floodplain, access, building, and permitting submissions necessary for IST to develop and use the Subject Property, applying only ordinary, neutral, and nondiscriminatory standards and procedures; and

    e. prohibiting the City from requiring IST to submit new rezoning or conditional use applications, pay duplicative application fees, or satisfy any waiting period, resubmission requirement, or similar restriction arising solely from the unlawful January 12, 2026, denial.

    f. discriminating against IST or the proposed mosque and Islamic community center on the basis of religion or religious denomination;

g. treating IST, its applications, or the Subject Property less favorably than comparable religious or nonreligious assemblies or institutions in the processing, review, conditioning, approval, or implementation of land use applications;

h. imposing materially more demanding standards, conditions, documentation requirements, delays, or procedural burdens on IST than the City imposes on comparable applicants, except to the extent supported by neutral, consistently applied, and fact-specific land use criteria; and

i. considering, adopting, or giving effect to public opposition based on Islam, Muslim identity, religious doctrine, religious denomination, or sectarian hostility when reviewing IST's applications or any subsequent approvals necessary to develop and use the Subject Property.

204. Award IST compensatory damages in an amount to be determined at trial for all proven injuries and losses caused by the challenged conduct:

a. against the City and the Individual Councilors found liable under 42 U.S.C. § 1983; and

b. against each Defendant found liable under the Oklahoma Religious Freedom Act with liability imposed jointly and severally to the extent permitted by law.

205. Award punitive damages against Pickel, Green, Ford, and Wimpee in their individual capacities under 42 U.S.C. § 1983, to the extent permitted by law, in an amount sufficient to punish and deter conduct undertaken that is malicious, oppressive, or shows

61

reckless or callous indifference to IST's federally protected rights. IST does not seek punitive damages against the City.

206.    Award IST all appropriate relief available against the City under RLUIPA, pursuant to 42 U.S.C. § 2000cc-2(a), including equitable relief and any monetary relief authorized by law.

207.    Award IST pre-judgment interest on all compensatory damages to the fullest extent permitted by law and post-judgment interest on the total monetary judgment pursuant to 28 U.S.C. § 1961.

208.    Award IST its reasonable attorneys' fees, taxable costs, and other recoverable litigation expenses pursuant to 42 U.S.C. § 1988(b), 51 O.S. § 256(B), Federal Rule of Civil Procedure 54(d), 28 U.S.C. § 1920, and all other applicable law.

209.    Retain jurisdiction to supervise and enforce Defendants' compliance with the Court's judgment and injunction, to resolve disputes concerning implementation of the ordered relief, and to grant any further necessary or proper relief pursuant to 28 U.S.C. § 2202.

210.    Grant IST such other and further legal or equitable relief as the Court deems just, proper, and necessary to remedy the violations alleged in this Complaint.

## JURY DEMAND

Plaintiff Islamic Society of Tulsa demands a trial by jury on all claims and issues so triable.

Dated: August 3, 2026                              Respectfully Submitted,

/s/ *Anthony M. Laizure*
Anthony M. Laizure (OBA 5170)
Laizure Law, PLLC
1437 South Boulder Ave., Ste. 1200
Tulsa, OK 74119
Ph:  (918) 749-0749
Fax:  (918) 518-7250
Email:  TLaizure@LaizureLaw.com

**CAIR NATIONAL**
**LEGAL DEFENSE FUND**
/s/Lena Masri
Lena Masri (VA 20251)**
Gadeir Abbas (VA 81161)**
Email: gabbas@cair.com
Meghan Murphy (MA 711469)
Email: mmurphy@cair.com
Veronica Laizure (OK 32040)**
Email: v-laizure@cair.com

453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

*Attorneys for Plaintiffs*

*** Admission forthcoming*